UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

NICHOLAS COOPER, *et al.*,

           Plaintiffs,

    v.

AGRIFY CORPORATION,

           Defendant.

CASE NO. 2:21-cv-00061-RSL-JRC

REPORT AND RECOMMENDATION

NOTED FOR: May 28, 2021

    This matter is before the undersigned on referral from the District Court (Dkt. 9), pursuant to 28 U.S.C. § 636 (b)(1)(A)–(B) and Local Magistrate Judge Rules MJR 1, MJR 3, and MJR 4, and on defendant's motion to dismiss, including their request for oral argument on their motion. Dkt. 12. The Court denies the request for oral argument, which is not necessary to resolve the issues presented in the motion to dismiss.

    Plaintiffs Nicholas Cooper and Richard Weinstein bring a variety of claims against Agrify ("defendant"), their former employer, related to various allegedly false promises that defendant made to them to persuade them to join defendant as executives. These promises and

1  agreements are contained in documents including a release of claims that Weinstein signed (the

2  "Weinstein Release"), Offer Letters that plaintiffs signed, and a "Special Bonus Plan."

3  Defendant moves to dismiss these claims, and the motion to dismiss should be granted in part

4  and denied in part.

5      Specifically, the Court finds that the Weinstein Release contains an arbitration clause

6  delegating the issue of arbitrability of claims arising related to the Release to an arbitrator.

7  Based on this clause, plaintiffs' causes of action arising from the Weinstein Release, as well as

8  other causes of action that would be barred if the Weinstein Release is valid, must be dismissed.

9      However, the Court finds that most of plaintiffs' claims for breach of contract and failure

10  to pay wages arising under the terms of their Offer Letters and the Special Bonus Plan are not

11  subject to this arbitration clause and, therefore, survive the motion to dismiss.  Plaintiffs have

12  plausibly alleged that they were entitled to certain compensation pursuant to their Offer Letters

13  and the Special Bonus Plan and that defendant failed to pay them these amounts.  Although most

14  of the claims should survive, the Court should dismiss claims for breach of contract and unpaid

15  wages to the extent they arise based on an "Equity Grant Provision" in the Offer Letters.  That

16  Equity Grant Provision is unenforceable.  The District Court should also dismiss plaintiff

17  Cooper's claim that he was wrongfully discharged in violation of Washington State public policy

18  but should grant plaintiffs leave to amend this claim.

19                                **BACKGROUND**

20      **I. Allegations of the Complaint**

21      Plaintiffs filed this matter in federal court in January 2021.  Dkt. 1.  They allege

22  jurisdiction over the matter because the amount in controversy exceeds $75,000, plaintiffs are

23

24

residents of Washington and Georgia, and defendant is a Nevada corporation with its principal

place of business in Massachusetts.  Dkt. 1, at 2.

Plaintiffs are former executives of TriGrow, a provider of "end-to-end cultivation

solutions for the indoor agriculture marketplace."  Dkt. 1, at 2.  Plaintiffs allege that TriGrow

worked closely with defendant Agrify (also known as Agrinamics), TriGrow's supplier,

including sharing employees and resources.  Dkt. 1, at 3.  On January 17, 2020, TriGrow was

sold via a reverse merger to defendant.  Dkt. 1, at 5.

Before the merger, in September 2018, plaintiffs allege that TriGrow, defendant, and

plaintiff Weinstein agreed that Weinstein would begin working for defendant and would be

provided 5% equity in both TriGrow and defendant.  Dkt. 1, at 4.  Plaintiff Weinstein alleges that

TriGrow accordingly granted him a 5% equity interest via its Employee Stock Ownership Plan

("ESOP") and that defendant "continued to reaffirm Agrify's promise to provide Weinstein"

with a 5% interest—yet ultimately never did.  Dkt. 1, at 4.

In addition, Weinstein alleges that in anticipation of the merger, defendant convinced him

that if he extinguished his ESOP interest in TriGrow—which constituted about 50% of the

TriGrow ESOP pool—defendant would provide him a 0.5% fully diluted equity interest in

Agrify.  Dkt. 1, at 5.  Weinstein accordingly cancelled his TriGrow interests in December 2019,

but he claims that defendant never followed through on its oral promise to provide Weinstein

with a corresponding 0.5% interest in defendant.  Dkt. 1, at 6.

Plaintiffs allege that after the merger, on January 23, 2020, they began working for

defendant; Cooper joined defendant as "Founder & Chief Evangelist" and Weinstein became the

"Vice President of Business Development."  Dkt. 1, at 5.  Plaintiffs argue that defendant required

Weinstein to sign a Release of Claims Agreement (the "Weinstein Release") on January 23,

1    2020.  Dkt. 1, at 6.  The Weinstein Release purported to release defendant and TriGrow from any

2    potential liability related to Weinstein, in return for employing Weinstein under the terms of an

3    Offer Letter and Special Bonus Plan.  Dkt. 1, at 6.  However, Weinstein alleges that defendant

4    breached its agreement to employ him under the terms in his Offer Letter.  *See* Dkt. 1, at 6.

5         Plaintiffs claim that as terms of their employment, they were both promised commission

6    and stock benefits, with the details set forth in the January 20, 2020 Offer Letters.  Dkt. 1, at 7.

7    They claim that the January 20 Offer Letters represented that they would receive "[a]dditional

8    commission and ESOP agreement" within 30 days of their start dates.  Dkt. 1, at 7.  On January

9    23, 2020, defendant's CEO also sent a Special Bonus Plan to plaintiffs, which promised them 1%

10   commission on defendant's booked revenue through June 30, 2020, and additional commission

11   plus 0.5% equity if defendant met certain booked revenue benchmarks by June 30, 2020.  Dkt. 1,

12   at 7.  Plaintiffs claim that defendant met the benchmarks in the Special Bonus Plan, but they

13   were never paid the benchmark-based commissions and equity. Dkt. 1, at 9.  Instead of

14   compensating them, plaintiffs allege that defendant terminated them shortly before June 30,

15   2020, in order to avoid paying them their earned wages. Dkt. 1, at 10.  Defendants allege that

16   they are each entitled to at least $593,000 and 0.5% equity interest on a fully diluted basis in

17   defendant. Dkt. 1, at 10.

18        Based on these allegations, plaintiffs bring a variety of causes of action.  Plaintiff

19   Weinstein alleges breach of contract related to the agreement in September 2018 to pay him 5%

20   equity in Agrify.  He also alleges breach of contract and promissory estoppel related to his

21   December 2019 agreement to extinguish his interest in TriGrow in return for a 0.5% interest in

22   defendant.  Plaintiffs also argue that the failure to pay them compensation promised in the

23   January 2020 Offer Letters and Special Bonus plans constituted unlawful wage withholding,

24

1    breaches of contract, and violations of the duty of good faith and fair dealing and unjustly

2    enriched Agrify.  Plaintiff Weinstein also alleges that the failure to compensate him as agreed

3    violated the Weinstein Release, which was obtained by fraud in the inducement.  And plaintiff

4    Cooper alleges that his termination shortly before June 30, 2020, was wrongful termination in

5    violation of public policy.  *See generally* Dkt. 1, at 11–22.

6    **II.  Motion to Dismiss**

7        Defendant now seeks dismissal of the entire complaint.  Dkt. 12.  Briefing on the motion

8    to dismiss is complete (Dkts. 17, 18), and the matter is ripe for decision.

9        In support of the motion to dismiss, defendant provides a variety of documents referenced

10   in the complaint:  the January 20, 2020, Offer Letters; the January 23, 2020, Weinstein Release;

11   and the January 23, 2020, email regarding the Special Bonus Plan.  *See* Dkt. 13.

12       A court may consider documents that were not physically attached to the complaint, if

13   their authenticity is not contested and the complaint necessarily relies upon them, when ruling on

14   a motion to dismiss, without converting the motion to dismiss to a summary judgment motion.

15   *See Lee v. City of Los Angeles*, 250 F.3d 668, 688 (9th Cir. 2001).  Here, the complaint relies

16   upon each document or email as setting forth terms of the parties' alleged agreements.  *See* Dkt.

17   1, at 7 (referring to the language of the Offer Letters); Dkt. 1, at 6 (referring to the terms in the

18   Weinstein Release); Dkt. 1, at 7 (referring to the terms of the Special Bonus Plan email).  And

19   while the parties dispute the significance and legal import of terms in these documents, they do

20   not dispute the overall existence or authenticity of the documents.  *See* Dkt. 17, at 9–12, 20

21   (relying on defendant's submissions of these documents).  Therefore, the Court relies on the

22   Offer Letters, Weinstein Release, and Special Bonus Plan email as presented in support of the

23   motion to dismiss, without converting this matter to summary judgment.

24

**DISCUSSION**

**I. Legal Standard**

Federal Rule of Civil Procedure 12(b)(6) permits a motion to dismiss if the complaint fails to state a claim upon which relief can be granted. A motion to dismiss focuses on the allegations in the complaint. The Court examines whether plaintiff alleges sufficient facts to that if taken as true, entitle him to relief. *See, e.g.*, *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

A complaint must contain "a short and plain statement of the claim showing that the pleader is entitled to relief," "in order to 'give the defendant fair notice of what the . . . claim is and the grounds upon which it rests[.]'" Fed. R. Civ. P. 8(a)(2); *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (quoting *Conley v. Gibson*, 355 U.S. 41, 47 (1957)). To survive a motion to dismiss, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *See Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 555).

When reviewing the motion to dismiss under Rule 12(b)(6), a court must accept as true all factual allegations—but not legal conclusions. *See Iqbal*, 556 U.S. at 678. "When there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief." *Id.*

**II. Claims Regarding and Predating the Weinstein Release (Claims 7, 8, 9, 13, 14)**

**A. Summary**

The Court begins by addressing defendant's arguments pertaining to plaintiffs' claims about alleged agreements predating and including the Weinstein Release. Since these claims are subject to arbitration, they need not be addressed on the merits at this time. Specifically, the Court addresses the viability of plaintiff Weinstein's claims that (1) in September 2018, he was

1    promised 5% equity in defendant, and defendant breached that contract (the seventh cause of

2    action); (2) in December 2019, plaintiff Weinstein agreed to cancel his interest in TriGrow in

3    return for a 0.5% equity interest in defendant, which defendant never granted and which forms

4    the basis for claims of fraudulent inducement and promissory estoppel (the thirteenth and

5    fourteenth causes of action), and (3) defendant fraudulently induced Weinstein to sign the

6    Weinstein Release and then breached that contract (the eighth and ninth causes of action).  Dkt.

7    1, at 16–17, 19–20.

8          Each of these claims either involves or arises from events predating the Weinstein

9    Release, which generally released defendant from liability for "any and all claims . . . of any kind

10   whatsoever . . . that [Weinstein] may have or have ever had against the Released Parties

11   [including defendant] . . . arising out of, or in any way related to any claim of [Weinstein] . . .

12   against Employer Group [including defendant] . . . excluding claims for TriGrow compensation."

13   Dkt. 13-3, at 2.  The Weinstein Release continues, "this release includes claims related to the

14   Employee's prior hire, benefits, employment . . . with the Employer Group [including defendant]

15   by reason of any actual or alleged act, omission, transaction, practice, conduct, occurrence, or

16   other matter from the beginning of time up to and including [January 23, 2020]" including all

17   claims for compensation "of any type whatsoever" and claims arising under tort or contract law.

18   Dkt. 13-3, at 2–3.

19         Thus, regarding each of the causes of action involving events up to and predating the

20   Weinstein Release, defendant generally argues that the Weinstein Release bars the claim.  *See*

21   Dkt. 12, at 22 (arguing that the Weinstein Release bars the seventh cause of action); Dkt. 12, at

22   30–31 (arguing that the Weinstein Release bars the thirteenth and fourteenth causes of action).

23         In response, plaintiffs generally argue that the Weinstein Release is not enforceable

24

1  because it was obtained by false representations.  Dkt. 17, at 20 (seventh cause of action); Dkt.

2  17, at 31 (thirteenth and fourteenth causes of action).  And regarding that topic, the parties

3  dispute whether the Weinstein Release's arbitration provision means that all claims arising

4  under—or potentially barred by—the Weinstein Release must be dismissed in favor of

5  arbitration.  *See* Dkt. 12, at 23–24, 26, 30; Dkt. 17, at 21–23, 25, 31.

6       Thus, the Court focuses on the parties' arguments regarding the validity of the Weinstein

7  Release's arbitration provision.

8                      **B.  Validity of the Arbitration Provision in the Weinstein Release**

9       The Weinstein Release's arbitration provision states that—

10     *[t]he Parties agree that any dispute, controversy, or claim arising out of or related*
       *to* the Employee's employment with TriGrow Systems, Inc. or termination of
11     employment from TriGrow, *this Agreement, or any alleged breach of this*
       *Agreement shall be governed by the Federal Arbitration Act (FAA) and submitted*
12     *to and decided by binding Arbitration* to be held within 15 miles of Boston,
       Massachusetts.  Arbitration shall be administered before American Arbitration
13     Association [sic] in accordance with that association's applicable rules for
       arbitration of contract and/or employment disputes at the time of the arbitration.

14

15  Dkt. 13-3, at 5–6 (emphasis added).  As noted above the Weinstein Release otherwise included

16  provisions purporting to release defendant from liability for claims including all breach of

17  contract and compensation-related claims arising before the execution of the Weinstein

18  Agreement.  *See* Dkt. 13-3, at 2–3 (stating that Weinstein released defendant, among others,

19  from claims related to his hire or benefits from the "Employer Group" (including defendant)).

20       The parties raise a number of arguments regarding the arbitration provision, but the

21  dispositive issue is the threshold matter of whether this Court or the arbitrator determines the

22  arbitrability of such claims.  The Supreme Court has held that parties can agree to arbitrate the

23  gateway question of whether an arbitration agreement covers certain claims or whether the

24

1    parties have agreed to arbitrate.  *Rent-A-Ctr., W., Inc. v. Jackson*, 561 U.S. 63, 68–69 (2010).

2    Such an agreement is valid "save upon such grounds as exist at law or in equity for the

3    revocation of any contract" (for instance, fraud or unconscionability).  *Id.* at 70 (quoting 9 U.S.C.

4    § 2).  Moreover, a challenge upon such grounds must attack not simply the agreement as a

5    whole, or even just the arbitration provision as a whole, but the particular written clause

6    regarding delegation of such matters to an arbitrator.  *See id.* at 71–72 ("Accordingly, unless

7    [plaintiff] challenged the delegation provision specifically, we must treat it as valid under § 2,

8    and must enforce it . . . leaving any challenge to the validity of the Agreement as a whole to the

9    arbitrator.").

10          Here, the Weinstein Agreement's arbitration provision contains no express reference to

11   who decides the matter of arbitrability.  But this is not the end of the matter.  The Ninth Circuit

12   has affirmed dismissal of claims that were subject to arbitration where, as here, the parties agreed

13   to incorporate American Arbitration Association ("AAA") rules.  *See Brennan v. Opus Bank*,

14   796 F.3d 1125, 1130 (9th Cir. 2015).  In *Brennan*, the Ninth Circuit explained that the

15   determination of whether there is an agreement to arbitrate and whether the agreement covers the

16   dispute can be expressly delegated to the arbitrator where the parties clearly and unmistakably

17   agreed to this.  *See id*.  The *Brennan* arbitration agreement stated that arbitration would occur in

18   accordance with the rules of the AAA—similar to the agreement here.  *See id.* at 1128.  The

19   Ninth Circuit expressly held that "incorporation of the AAA rules constitutes clear and

20   unmistakable evidence that contracting parties agreed to arbitrate arbitrability."  *Id.* at 1130.  The

21   *Brennan* court therefore affirmed dismissal of a claim that the agreement to arbitrate was

22   unconscionable where, as here, plaintiff made no argument particularly directed toward the

23   arbitration agreement's delegation clause, rather than simply the arbitration provision as a whole.

24

1    *See id.* at 1133.

2         Plaintiffs' arguments in the responsive brief are directed toward the Weinstein Release as

3    a whole or the arbitration provision, not simply the arbitration agreement's wording regarding

4    the applicable AAA rules.  *See* Dkt. 17, at 22–23 (arguing that the Weinstein Release was

5    obtained by fraudulent inducement, that the Weinstein Agreement is unconscionable, and that the

6    location of arbitration provision in the Arbitration Provision is unconscionable).  And although

7    plaintiffs argue that they did not agree to "arbitrate arbitrability" (Dkt. 17, at 23), the law is to the

8    contrary in the Ninth Circuit, based on the clear text of the clause agreeing to abide by the AAA

9    rules.

10        Thus, plaintiff's causes of action regarding the enforceability of the Weinstein Release

11   are subject to arbitration.  *See* Dkt. 1, at 24–25 (eighth and ninth claims).  So too, the causes of

12   action pertaining to matters arising before the Weinstein Release and that defendant argues are

13   related to the Weinstein Release (since that release would bar those claims) are also subject to

14   arbitration.  *See* Dkt. 1, at 16, 19–20 (seventh, thirteenth, and fourteenth claims).  Therefore, the

15   Court should grant defendant's request to dismiss these claims and need not address the parties'

16   remaining arguments.

17   **III.  Claims Regarding Offer Letters and Special Bonus Plans (claims 1, 2, 3, 5)**

18        Plaintiffs' first, second, third, and fifth claims pertain to whether defendant failed to pay

19   contractually required commissions, equity, and shares to Cooper and Weinstein as set forth in

20   the Offer Letters and Special Bonus Plans.  *See* Dkt. 1, at 11–15.  Plaintiffs allege that the

21   Special Bonus Plans entitled them to (1) a 1% cash commission on pre-June 30, 2020, booked

22   revenue and (2) an extension of the cash commission plan and 0.5% in equity if defendant

23   exceeded target booked revenue before June 30, 2020.  *See* Dkt. 1, at 7.  They also separately

24

1    argue that their Offer Letters entitled them to shares in defendant's ESOP.  *See* Dkt. 1, at 10.

2    And they allege that defendant failed to compensate them with the commissions, equity, and

3    shares due under both the Special Bonus Plans and the Offer Letters.  *See* Dkt. 1, at 11.

4    Defendant makes a number of arguments that these claims should be dismissed.  The

5    Court addresses these arguments in turn, below.

6                    **A.  Special Bonus Plan Benchmark Provisions and Automatic Commission**

7    Defendant first focuses on the allegation that the Special Bonus Plans promised plaintiffs

8    additional commissions and equity in defendant if defendant met a certain booked revenue

9    benchmark by June 30, 2020.  The parties extensively dispute whether the final agreement

10   between them meant that plaintiffs were entitled to the additional compensation if the "Former

11   Trigrow Executive Team" achieved these benchmarks (as defendant contends) or if simply

12   defendant as a whole achieved these benchmarks (as plaintiffs contend).  *See* Dkt. 12, at 14.

13   Defendant asserts that January 19, 2020, and January 23, 2020, emails from an Agrify

14   principal make clear that the Special Bonus Plan agreement required that former TriGrow

15   executives (such as plaintiffs) had to be responsible for defendant meeting the benchmarks.  *See*

16   Dkt. 12, at 15–16.  Plaintiffs argue that the January 23, 2020, email memorializes the parties'

17   final and complete agreement, which refers to defendant's performance as a whole.  Dkt. 17, at

18   9.

19   Resolution of this dispute is not necessary to resolve the motion to dismiss.  This is

20   because even if the Court agreed with defendant that the Special Bonus Plans required former

21   TriGrow executives (and not merely defendant as a whole) to achieve the benchmarks, plaintiffs

22   have alleged facts creating a reasonable inference that this condition was met.

23   Specifically, plaintiffs allege in the complaint that by March 31, 2020, defendant had

24

1    booked revenue of approximately $19 million and that by the end of September 2020, defendant

2    had booked purchase orders of $36.9 million.  Dkt. 1, at 9.  And plaintiffs allege that they (as

3    former members of the TriGrow executive team) were responsible for procuring and enabling "a

4    substantial portion of the purchase orders and purchase commitments booked by Agrify in

5    2020."  Dkt. 1, at 9.  It is a reasonable inference that if plaintiffs were responsible for procuring

6    and enabling a "substantial portion" of the booked revenue alleged in the complaint, they

7    generated and secured at least $10 million before June 30, 2020.  *See* "substantial," Merriam-

8    Webster.com (last visited April 30, 2021) (A substantial amount is "largely but not wholly that

9    which is specified.").[1]  The Court disagrees with defendant's argument to the contrary.  *See* Dkt.

10   18, at 7.

11          In addition, the Court separately notes that plaintiffs allege that regardless of whether any

12   particular benchmark was met, the Special Bonus Plans entitled them to a 1% commission on

13   pre-June 30, 2020, booked revenue.  Dkt. 1, at 7.  Although defendant argues that the extension

14   of the commission was not triggered (*see* Dkt. 11, at 14), defendant does not make any particular

15   argument that it never agreed to compensate plaintiffs with 1% of defendant's booked revenue

16   before June 30, 2020, regardless of whether any benchmarks were met.  And although plaintiffs

17   argue in their responsive brief that they were automatically entitled to this 1% commission (Dkt.

18   17, at 10), defendant's reply brief in support of their motion focuses only on the allegations about

19   whether the benchmark provisions were satisfied.  *See* Dkt. 18, at 7.  Plaintiffs have plausibly

20   alleged that defendant agreed to pay them an automatic 1% of pre-June 30, 2020, booked

21   revenue yet failed to do so.  *See* Dkt. 1, at 11–13 (alleging failure to pay "commission" as set

22   forth in the Special Bonus Plan to plaintiffs).  This, too, supports denial of the motion to dismiss

23

24          [1] https://www.merriam-webster.com/dictionary/substantial.

1   claims pertaining to unpaid wages and breach of contract arising out of the Offer Letters and

2   Special Bonus Plans.

3                       **B.  Georgia's Wage Withholding Statute**

4           Defendant's next argument specifically targets plaintiff Weinstein's allegation that the

5   failure to compensate him as agreed violated Georgia's wage withholding statute, O.C.G.A. §

6   34-7-2.  Defendant argues that this statute does not provide a claim for failure to pay wages,

7   instead solely providing a claim for failure to pay wages *on time* or *in the agreed form*.  Dkt. 12,

8   at 15–16.

9           O.C.G.A. § 34-7-2 provides in pertinent part that,

10                  (b) Every person, firm, or corporation [with exceptions not argued to apply
    here] . . . shall, upon the discretion of such person, firm, or corporation, make wage
11          and salary payments to such employees or to their authorized representatives:
                    (1) By lawful money of the United States;
12                  (2) By check;
                    (3) By credit to a payroll card account; or
13                  (4) With the consent of the employee, by authorization of electronic credit
                    transfer to his or her account with a bank, trust company, or other financial
14                  institution authorized by the United States or one of the several states to
                    receive deposits in the United States.
15                  Such payments shall be made on such dates during the month as may be
            decided upon by such person, firm, or corporation; provided, however, that the
16          dates so selected shall be such that the month will be divided into at least two equal
            periods; and provided, further, *that the payments made on each such date shall in*
17          *every case correspond to the full net amount of wages or earnings due the*
            *employees for the period for which the payment is made.*

18

19   O.C.G.A. § 34-7-2 (emphasis added).

20          Defendant cites an unpublished ruling from the Northern District of Georgia.  *See*

21   *Williams v. Long*, No. 1:09-CV-1021-TCB, 2009 WL 10670687, at *1 (N.D. Ga. Sept. 22, 2009).

22   Regarding the claim that wages owed were not paid after an employee was laid off, the District

23   Court assumed that another statute, O.C.G.A. § 51-1-6, provided a mechanism for enforcing §

24

34-7-2 through a private right of action. *Id.* at *2. However, the District Court concluded that private right of action encompassed only a challenge to the form or timing of wage payments made during plaintiffs' employment. *Id* (ruling that "the proper route to recovery is through contract law"). Defendant argues that based on *Williams v. Long*, the Court should find that there is no private right of action under § 34-7-2 for payments of amounts representing wages for work performed, after termination.

However, *Williams* preceded the Northern District of Georgia's ruling in *Wright v. Scales 925 Atlanta LLC* (uncited by the parties herein), where plaintiffs sued former employers for failing to pay their last paychecks after plaintiffs quit, citing O.C.G.A. § 34-7-2. No. 1:16-CV-02425-LMM, 2017 WL 10378237, at *2 (N.D. Ga. Jan. 18, 2017). There, a defendant also argued that § 34-7-2 provided no cause of action independent from a breach of contract claim. *Id.* at *6. The District Court disagreed, concluding that taken together, §§ 51-1-6 and 34-7-2 create a cause of action of negligence per se for breach of the legal duty to pay wages in a certain manner. *See Wright*, 2017 WL 10378237, at *6. The District Court specifically noted that O.C.G.A. § 34-7-2(b) requires, among other things, that wage payments correspond to the full amount due on the date of payment. *See Wright*, 2017 WL 10378237, at *6.

Notwithstanding defendant's arguments to the contrary, there is, therefore, at least some case law that § 51-1-6 creates a private right of action under § 34-7-2 for a suit for the breach of the duty to pay wages that, as pertinent here, "correspond to the full net amount of wages or earnings due." *Wright*, 2017 WL 10378237, at *6 (quoting O.C.G.A. § 34-7-2(b)). Neither does the Court agree that plaintiffs' failure to cite O.C.G.A. § 51-1-6 in their complaint merits dismissal of this claim with leave to amend. *See Williams*, 2009 WL 10670687, at *2 (rejecting an argument that O.C.G.A. § 51-1-6 must be included in a complaint because "the Court is

1    skeptical that the law requires Plaintiffs to plead their complaint with the level of specificity

2    urged by Defendants.").

3          In short, the Court disagrees with defendant's argument that plaintiff Weinstein cannot

4    bring a claim under O.C.G.A. § 34-7-2.

5                          **C.  Grants of Agrify Shares**

6          Defendant next argues that a particular portion of the claimed compensation agreement—

7    the "Equity Grant Provision"—is unenforceable.  The Court agrees with this argument, although

8    it merits dismissing only part of the relevant claims.

9          Plaintiffs allege that their January 20, 2020, Offer Letters agreed to give them an

10   unspecified amount of shares in defendant that were to be granted within 30 days of February 1,

11   2020.  *See* Dkt. 1, at 10.  They assert that defendant violated these terms by failing to grant

12   Weinstein any shares within 30 days, by offering him stock options in April 2020, and by

13   cancelling this grant just weeks later when they terminated Weinstein's employment.  Dkt. 1, at

14   10.  And plaintiffs argue that defendant violated these terms by granting Cooper stock options on

15   May 6, 2020, but cancelling the options just over a month later when defendant terminated

16   Cooper's employment.  Dkt. 1, at 10.  Thus, plaintiffs argue that it was a breach of contract and

17   wrongful wage withholding for defendant not to pay "shares due under the Offer Letter[s]" owed

18   to Cooper and Weinstein.  *See* Dkt. 1, at 11–15.

19          Defendant provides the Offer Letters which, in pertinent part, state,

20          **EQUITY GRANT:** Subject to the requisite approval by the Company's Board of
            Directors, you will be granted shares of the Company's common stock (the

21          "Restricted Shares"), subject to a restricted stock agreement in form delivered with
            this letter, which will provide for, among other things, vesting of the Restricted

22          Shares such that one-quarter of the Restricted Shares will vest on the first
            anniversary of the Start Date and the remaining three-quarters will vest in equal

23          monthly installments over the following 36 months.  The grant amount will be

24

determined within 30 days of Start Date.

Dkt. 13-1, at 2; Dkt. 13-2, at 2.

Defendant argues, among other things, that this agreement is unenforceable because it is an "agreement to agree" (that is, it would require further agreement to fix the essential terms of the agreement). *See* Dkt. 12, at 16–19.

The Court agrees with defendant that the offer of an amount of shares "to be determined" within 30 days leaves open an essential term of a stock grant agreement: the number of shares. *See, e.g.*, *Keystone Land & Dev. Co. v. Xerox Corp.*, 94 P.3d 945, 948 (Wash. 2004) (holding that an agreement to agree is "an agreement to do something which requires a further meeting of the minds of the parties and without which it would not be complete" and that such is "unenforceable in Washington"); *see also Sandeman v. Sayres*, 50 Wn.2d 539, 542 (1957) (holding that a contract granting a "suitable incentive" to an employee in an amount to "be decided upon" in three months was "an agreement for an agreement"); *Smith Serv. Oil Co. v. Parker*, 250 Ga. App. 270, 270–71 (2001) (contract to supply gasoline unenforceable where the contract did not specify the amount of gasoline to be supplied). Thus, the Court finds that to the extent plaintiffs are suing for failure to grant the stock options in accordance with the Offer Letters' Equity Grant term, such a contract is unenforceable and these claims are subject to dismissal.

In response to defendant's argument, plaintiffs assert that they are entitled to the stock options not because of a breach of contract but as damages on their wrongful termination claims. *See* Dkt. 17, at 17. Plaintiffs assert that "[b]ut for" wrongful termination, Cooper's 63,593 stock options and Weinstein's 33,916 stock options would have vested. *See* Dkt. 17, at 17. However, defendant argues specifically that plaintiffs' breach of contract and failure to pay wages claims

1   must be dismissed as related to alleged agreements set forth in their Special Bonus Plans and

2   Offer Letters.  Regardless of whether separately, plaintiffs can receive the unvested stock options

3   as damages on their wrongful termination claims, the Court agrees that the Equity Grant

4   Provision in the Offer Letters is unenforceable.

5           Thus, the Court overall finds that the motion to dismiss plaintiffs' claims for violation of

6   wage payment statutes and breaches of contract related to the Special Bonus Plans and Offer

7   Letters should be denied—except that inasmuch as plaintiffs rely on the Equity Grant Provision

8   in the Offer Letters, that claim should be dismissed.

9   **IV.  Breaches of Implied Covenant of Good Faith and Fair Dealing (Claims 4, 6)**

10          Plaintiffs allege that defendant breached the implied covenant of good faith and fair

11  dealing by withholding wages due and depriving them of the full benefits of their contracts with

12  Agrify.  Dkt. 1, at 14–15.  Defendant makes several arguments for dismissal of these claims,

13  which the Court addresses in turn.

14          As defendant points out, these claims are essentially reiterating the allegations of

15  plaintiffs' claims for breach of contract.  *See* Dkt. 18, at 10.  However, the Court disagrees with

16  defendant that therefore, the causes of action for breaches of the implied covenant of good faith

17  and fair dealing must be dismissed at this stage.

18          In Georgia, "there is no independent cause of action for violation of the covenant apart

19  from breach of an express term of the contract."  *Morrell v. Wellstar Health Sys., Inc.*, 280 Ga.

20  App. 1, 5, 633 S.E.2d 68, 72 (2006) (citing *Stuart Enterprises Int'l v. Peykan, Inc.*, 252 Ga.App.

21  231, 234, 555 S.E.2d 881 (2001)); *see also Alan's of Atlanta, Inc. v. Minolta Corp.*, 903 F.2d

22  1414, 1429 (11th Cir. 1990).  "Thus, to state a claim for breach of the implied duty of good faith

23  and fair dealing, a plaintiff must set forth facts showing a breach of an actual term of

24

agreement." *Clark v. Aaron's, Inc.,* 914 F. Supp. 2d 1301, 1308 (N.D. Ga. 2012) (internal

quotation marks and citation omitted).  Nevertheless, courts have declined to dismiss a cause of

action for breach of the duty where the corresponding breach of contract claim survived:  "the

causes of action are separate and distinct and may be plead simultaneously" and the Georgia law

cited above simply explains that "to state a claim for breach of the implied covenant, the plaintiff

must be found to have stated a claim for breach of contract."  *Id.*

   Similarly, applying Washington law, courts have also declined to dismiss corresponding

claims for breach of the duty of good faith and fair dealing on the basis that they are redundant

with claims of breach of contract:

> [W]hether Defendant breached the explicit terms of the contract is a separate issue
> from whether or not Defendant acted in bad faith. The duty of good faith implied
> in every contract is defined as "honesty in fact in the conduct or transaction
> concerned." [RCW] 62A.1-201; *see also Ward v. Coldwell Banker/San Juan
> Properties, Inc.*, 872 P.2d 69, 74 (Wash. Ct. App. 1994). Whether a party's conduct
> was, in fact, honest is a separate issue from whether a party breached a specific
> provision of a written agreement.  While it is true that "[t]he duty to cooperate exists
> only in relation to performance of a specific contract term," *Badgett v. Security St.
> Bank*, 807 P.2d 356, 360 (Wash. 1991) (emphasis added), that does not mean that
> the duty collapses down into only those terms of the written agreement.

*Daymon Worldwide Inc. v. S.C. Johnson & Son Inc.*, No. C06-1322-JCC, 2007 WL 9776405, at

*3 (W.D. Wash. Jan. 25, 2007); *see also Veritas Operating Corp. v. Microsoft Corp.*, No. C06-

0703JCC, 2008 WL 474248, at *4–*5 (W.D. Wash. Feb. 4, 2008) ("It would defy logic to find

that this type of claim [for breach of the implied covenant of good faith and fair dealing] is

precluded by the existence of a contract, given the fact that Washington law clearly recognizes

the duty and requires the existence of a valid contract in order for it to apply.").  The Court finds

this reasoning persuasive.  Notably, defendant's authority to the contrary involves cases where

the claim for breach of contract did not survive (unlike here).  *See* Dkt. 49, at 14, *Griffin v.*

1    *GMAC Commercial Finance, LLC*, No. 1:05-cv-199-WBH-GGB (N.D. Georgia, July 18, 2006);

2    *Trimble v. Washington State Univ.*, 140 Wash. 2d 88, 97 (2000).

3         Defendant's second argument is that plaintiffs were at-will employees and that allowing a

4    claim for violation of the implied covenant of good faith and fair dealing would, as a practical

5    matter, allow an end-run around the "at will" nature of plaintiffs' employment. *See* Dkt. 12, at

6    19–22.  Defendant asserts that essentially, under the circumstances, to allow these claims is to

7    hold defendant liable for terminating plaintiffs, even though plaintiffs were "at will" employees.

8    *See* Dkt. 12, at 19–22.

9         The Court is not persuaded that to allow plaintiffs to bring their claims in this matter

10    would upend "at will" employment in the manner that defendant argues.  Viewed in the light

11    most favorable to them, plaintiffs allege that regardless of whether or not they were terminated,

12    they were owed automatic 1% commissions and additional commissions and equity if defendant

13    met certain benchmarks.  (As noted, plaintiffs also argue that they were entitled to Equity Grants,

14    but they have failed to show that such an agreement was enforceable.)  Contrary to defendant's

15    argument, viewing the facts alleged in the complaint in the light most favorable to plaintiffs, they

16    did not need to be employed as of June 30, 2020, to be eligible for all such compensation. *See*

17    Dkt. 18, at 10.

18         For these reasons, the Court should decline to dismiss the claims for violation of the

19    covenant of good faith and fair dealing at this time.

20    **V.  Unjust Enrichment Claims (Claims 10, 11)**

21         Plaintiffs' tenth and eleventh causes of action are that defendant was unjustly enriched by

22    the January 2020 employment agreements, by which defendant obtained the benefit of plaintiffs'

23    employment without having to compensate them for wages due.  Dkt. 1, at 17–18.  Defendant

24

1    argues that such a cause of action cannot exist independently from a claim for breach of contract

2    under Washington or Georgia law, where defendant does not dispute that there was an

3    employment agreement between the parties.  Dkt. 12, at 26–27.

4         Defendant is correct that as a general matter, a party cannot obtain damages for both

5    breach of contract and unjust enrichment arising out of the breach of that contract.  Applying

6    Georgia law, a District Court in Georgia has held that a plaintiff could not recover for both unjust

7    enrichment and breach of contract.  *Clark v. Aaron's, Inc.*, 914 F. Supp. 2d 1301, 1309 (N.D. Ga.

8    2012).  And applying Washington law, in an unpublished decision, a court in this District has

9    similarly observed that the existence of a valid contract precludes an unjust enrichment claim.

10   *Scott v. Carr*, No. C20-0236-RSM, 2020 WL 6381812, at *5 (W.D. Wash. Oct. 30, 2020).

11        Yet, both of these cases declined to dismiss the unjust enrichment claims,

12   notwithstanding plaintiffs' pleading breach of contract claims.  This is because it is premature to

13   dismiss the alternative unjust enrichment claims so long as there remain questions about the

14   validity and enforceability of the underlying contracts.  *See Clark*, 914 F. Supp. 2d at 1309–10;

15   *Scott*, 2020 WL 6381812, at *5.

16        Similarly here, the tenth and eleventh causes of action expressly base the unjust

17   enrichment claims on the contractual relationship created by the Offer Letters and Special Bonus

18   Agreements.  *See* Dkt. 1, at 17–18.  Defendant states that it does not contest the existence of

19   these agreements (Dkt. 12, at 8 n.8), but defendant does not state that the agreements were

20   enforceable and valid contracts.  To decide that matter at this stage would be premature.

21        Therefore, the Court should decline to dismiss plaintiff's tenth and eleventh claims at this

22

23

24

1   time.

2   **VI.  Wrongful Termination in Violation of Public Policy (Cooper)**

3       Plaintiff Cooper alleges that Agrify terminated him in order to avoid paying his wages,

4   which gives rise to a claim of wrongful termination in violation of public policy under

5   Washington State law.  Dkt. 1, at 19.  Defendant argues that this claim should be dismissed

6   because there is no such cause of action for failure to pay wages.  Because plaintiffs respond by

7   asserting a cause of action not plausibly alleged in their complaint, the twelfth claim should be

8   dismissed with leave to amend.

9       The tort of wrongful discharge in violation of public policy is a narrow exception from

10  at-will employment in Washington State.  *Martin v. Gonzaga Univ.*, 191 Wn.2d 712, 723 (2018).

11  "The tort for wrongful discharge in violation of public policy has generally been limited to four

12  scenarios: '(1) where employees are fired for refusing to commit an illegal act; (2) where

13  employees are fired for performing a public duty or obligation, such as serving jury duty; (3)

14  where employees are fired for exercising a legal right or privilege, such as filing workers'

15  compensation claims; and (4) where employees are fired in retaliation for reporting employer

16  misconduct, i.e., whistle-blowing.'"  *Id.* (quoting *Gardner v. Loomis Armored, Inc.*, 128 Wn.2d

17  931, 936 (1996)).

18      Here, plaintiffs state that they are alleging that Cooper was terminated because in April

19  and June 2020, he complained to Agrify executives regarding his compensation.  *See* Dkt. 17, at

20  28.  Thus, plaintiffs argue that Cooper was terminated under scenario (4) from *Martin*—

21  retaliation for reporting employer misconduct.  Dkt. 17, at 28–29.

22      The problem with plaintiffs' argument, however, is that they do not allege in the

23  complaint that Cooper was terminated for complaining about his wages or that this is the basis

24

for his claim.  Instead, plaintiffs simply allege that Cooper was terminated eleven days before the first commission term ended and that Cooper was terminated to avoid paying him wages.  Dkt. 1, at 10, 19.  The first time that a reference to plaintiff Cooper complaining about his wages and being fired as retaliation appears is in the responsive brief to defendant's motion to dismiss.  *See* Dkt. 17, at 26.

Therefore, the Court should dismiss Cooper's wrongful discharge in violation of public policy claim (claim 12) with leave to amend.  Solely for purposes of determining whether to grant leave to amend, the Court does not find that it would be futile to allow such a claim for wrongful discharge in violation of public policy as retaliation for complaints of failure to pay wages.  *E.g. Winter v. Toyota of Vancouver USA, Inc.*, 132 Wn. App. 1029 (2006) ("[A]n employee's right to receive wages due, in compliance with chapter[] . . . 49.52 RCW, is among the legal rights protected by the tort of wrongful discharge in violation of public policy.").

## CONCLUSION

For the reasons set forth above, the Court recommends that the motion to dismiss be granted in part and denied in part.  Specifically, the District Court should dismiss causes of action 7, 8, 9, 13, and 14 because they must be arbitrated.  The District Court should also dismiss claim 12, but should grant leave to amend this claim.  Any amended complaint should be filed within 21 days of the Order on this Report and Recommendation.  All remaining causes of action survive the motion to dismiss, except that as related to claims 1, 2, 3, and 5, plaintiffs cannot argue that the Equity Grant Provision entitled them to compensation, since that Provision is unenforceable.

Pursuant to 28 U.S.C. § 636(b)(1) and Fed. R. Civ. P. 72(b), the parties shall have fourteen (14) days from service of this Report to file written objections.  *See also* Fed. R. Civ. P. 6.  Failure to file objections will result in a waiver of those objections for purposes of *de novo* review by the district judge, *see* 28 U.S.C. § 636(b)(1)(C), and can result in a result in a waiver of those objections for purposes of appeal. *See Thomas v. Arn*, 474 U.S. 140 (1985); *Miranda v. Anchondo*, 684 F.3d 844, 848 (9th Cir. 2012) (citations omitted). Accommodating the time limit imposed by Rule 72(b), the Clerk is directed to set the matter for consideration on **May 28, 2021,** as noted in the caption.

Dated this 12th day of May, 2021.

J. Richard Creatura
Chief United States Magistrate Judge